UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| HOOSIERVAC, LLC and HOOSIERX, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 2:24-CV-424-PPS-JEM |
| STEPHEN SCOTT, *et al.*, | ) ) ) | |
| Defendants. | | |

**OPINION AND ORDER**

This matter is before the Court on several Motions to Dismiss filed by all 25 named Defendants in this case. [DE 56; DE 90; DE 94; DE 120; DE 122; DE 124; DE 126; DE 128; DE 130; DE 149]. For economy's sake and because each of the motions raise similar arguments, I address all of the motions in a single opinion. And because the complaint does not tell a plausible antitrust story that holds together, it must be dismissed in its totality.

## Background

This case has a healthy procedural background which I'll review first before getting into the thrust of the factual allegations. HoosierVac, LLC and HoosierX, LLC initiated this lawsuit on November 13, 2024, by filing a complaint in Carroll County Circuit Court. [DE 4]. I will refer to the plaintiffs collectively as HoosierVac unless specificity requires otherwise. On December 3, 2024, the Local 103 Defendants removed the case to federal court. [DE 1]. After filing its original complaint in state court,

HoosierVac filed two amended complaints. [DE 15; DE 45]. The now operative complaint—the Second Amended Complaint or "SAC"—is the third one to have been filed in this case. [DE 45].

The SAC is best described as shotgun pleading aimed at nearly every player in the hydrovac industry in central and northern Indiana. It asserts claims against 25 different named Defendants and ten "John Does" for a total for 35 Defendants. [DE 45 at 2-3].[1] The allegations made against the Defendants in the SAC are, quite frankly, difficult to understand. As best I can tell, Plaintiffs allege that all 35 Defendants in this lawsuit have acted in concert to exclude HoosierVac from the hydrovac industry in which it operates.

HoosierVac and HoosierX are hydrovac excavation companies which operate in northern Indiana. [DE 45 at 4-5]. Hydrovac companies use hydro-excavation—a process of combining pressurized water and an industrial strength vacuum—to excavate soil and debris. [*Id.* at 4]. Plaintiffs explain that the hydrovac industry "plays a critical role in modern infrastructure, construction, and environmental management" and "provides non-destructive digging solutions essential for maintaining public utilities, supporting industrial operations, and executing projects in environmentally sensitive areas." [*Id.* at 3]. Plaintiffs tell me the conduct alleged in this lawsuit directly impacts

---

[1] The page numbers used to cite to the SAC are the page numbers located in the top right-hand corner of the page. This number differs from the page numbers found at the bottom center of the page because the SAC was filed with a completely blank page as the first page.

their ability to compete and contract with clients including public utilities such as NIPSCO and others. [*Id*. at 4].

HoosierVac is a union employer with its headquarters in Delphi, Indiana. [DE 45 at 12]. Lauren Mullins is the majority owner and managing member of HoosierVac. [*Id*.] By contrast, HoosierX is a non-union employer headquartered in Camden, Indiana and owned and operated by Chris Mullins (Lauren's husband). [*Id*.] Despite their different headquarters, Plaintiffs admit that HoosierVac and HoosierX operate out of the same building. [*Id*.] Plaintiffs say that despite the marital relationship of their owners and same address, they operate as different businesses maintaining "independent operational policies, bank accounts, and management." [*Id*.]

Foreshadowing that this case involves a jurisdictional dispute between HoosierVac and the labor unions relevant to their industry, Plaintiffs say that their hydrovac businesses are located in the jurisdictional areas of both the International Union of Operating Engineers Locals 103 and 150. [*Id*. at 5-6]. Both Locals are the labor unions which represent hydrovac workers in their respective jurisdictions.

Plaintiffs say that their SAC "arises from a wide-ranging conspiracy and unlawful scheme" orchestrated by all 25 named Defendants. [DE 45 at 9]. The purpose of the alleged scheme is to limit HoosierVac's access to the hydrovac market, limit or eliminate competition, depress innovation, defame HoosierVac, interfere with HoosierVac's existing contracts, breach obligations of Collective Bargaining Agreements (CBAs), and obstruct HoosierVac from completing its hydrovac work. [*Id*. at 10]. Stating

3

the obvious, the two Locals at issue here do not compete in the hydrovac industry; they supply labor to it. The SAC does not say, and it is entirely unclear, why the labor unions would desire to plot with HoosierVac's competitors to push them out of their industry.

Plaintiffs state that in furtherance of the alleged conspiracy, "Defendants engaged in traditional antitrust violations such as group secondary boycotts, limited Plaintiffs and others access to the hydrovac market, interfering with hydrovac end users to eliminate or limit competition into the market, depress innovations, and other tactics such as the deliberate interference with existing contracts, defamatory communications to third parties, breach of obligations arising from the CBA contract, interfering with witness relevant to this action and targeted obstruction of Plaintiffs and others from hydrovac work." [*Id.* at 10].

Plaintiffs' complaint makes the broad allegation that the 25 Defendants are in cahoots (presumably with the John Doe defendants) to execute a wide-ranging conspiracy to push HoosierVac out of the hydrovac industry. However, the complaint is long on conclusions but short on facts. It contains very few specifics regarding the actions of the Defendants named in the lawsuit. Interestingly, as noted above, the two primary Defendants in this case are the labor unions, the Local 103 and the Local 150, who represent hydrovac workers in their jurisdiction and do not compete with HoosierVac for work.[2] As I've said, Plaintiffs have not attempted to offer a reason or

---

[2] I've described the Local 103 and the Local 150 as the "primary" Defendants in this matter because most of the individual Defendants named in the case are Business Agents (BAs) of these two unions.

rationale as to why the labor unions would desire to push HoosierVac out of the hydrovac industry when at least one of the Plaintiffs employs a union workforce.

Without hardly any detail as to how each Defendant has contributed to the alleged conspiracy, Plaintiffs assert five causes of actions against all Defendants. The five causes of action are:

- Count I- Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
- Count II- Monopolization or Attempted Monopolization (15 U.S.C. §2)
- Count III- Tortious Interference with Contract and Prospective Business Relations
- Count IV- Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing
- Count V- Violation of the Privacy Act

[DE 45 at 32-34].

Predictably, each of the Defendants named in this lawsuit has filed a motion to dismiss the suit in its entirety. [*See* DE 56; DE 90; DE 94; DE 120; DE 122; DE 124; DE 126; DE 128; DE 130; DE 149]. Each of the Defendants declare that Plaintiffs' SAC falls far short of Rule 8's requirement that a complaint provide a "short and plain" statement of the claim showing that the pleader is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2).

With this background in mind, let's turn to each of the Motions to Dismiss filed by the Defendants in this case.

**Legal Standard**

Let's start with some basic legal standards because they are critically important to the motions presently before the Court. Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which

relief can be granted. Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, all well-pleaded facts in the complaint are taken as true and all reasonable inferences from those facts are drawn in the plaintiff's favor. *See, e.g.*, *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022); *Cirrus ABS Corp. v. Strategic Am., Inc.*, 2024 WL 4554021, at *2 (N.D. Ind. Oct. 22, 2024).

To survive a motion to dismiss, a plaintiff must "nudge . . . their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard was an important sea change in federal pleading standards, and it displaced the less strict pleading standards enunciated by the Supreme Court long ago in *Conley v. Gibson*, 355 U.S. 41 (1957). *Twombly* was an antitrust case, just like ours. And for a couple of years after it was decided, there was a question of whether *Twombly*'s plausibility standard applied only to antitrust cases. Two years later, the Supreme Court answered that question with a resounding no. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court made it clear that the *Twombly* plausibility standard applied to all civil litigation, not just antitrust cases.

As the Seventh Circuit put it, what this all means is that allegations in a complaint must suggest a right to relief that rises above a "speculative level" and if they do not, the plaintiff pleads himself out of court. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In other words, a plaintiff can't just sue 35 defendants, throw some words on a page— "secondary boycott!", "conspiracy!", "Sherman Act!"—and expect that those lofty conclusions will

carry the day. In this case, although the SAC alleges a series of anecdotes, there is no thread holding them together. All of which is to say that the SAC fails to follow basic rules of pleading and does not tell a "story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## Discussion

Before diving into each of the Defendants' Motions to Dismiss, I will state at the outset that Plaintiffs have failed to state a claim for Count V (Violation of the Privacy Act) against any of the Defendants named in this action. As explained in each of the 10 motions to dismiss presently before me, the Privacy Act (5 U.S.C. § 552a) only provides a cause of action against federal agencies. *See, e.g.*, *Lengerich v. Columbia Coll.*, 633 F. Supp. 2d 599, 605 (N.D. Ill. 2009) ("It is undisputed that only federal "agencies" can be held liable under the Privacy Act."); *Polchowski v. Gorris*, 714 F.2d 749, 752 (7th Cir. 1983) (explaining that the Privacy Act "applies only to agencies of the United States Government"). Plaintiffs have not alleged that any of the Defendants are a federal agency and none of the Defendants fit the definition of an "agency" for the purposes of the Privacy Act. *See* 5 U.S.C. § 551(1). For that reason, Count V is dismissed as to each of the Defendants; nothing more need be said about that.

Below, I discuss each motion to dismiss separately. However, the allegations made against the Defendants are so intertwined and interconnected that there will be substantial overlap in my discussion. Recall, the complaint brings all five counts against

all 35 Defendants (the 25 named Defendants as well as John Does 1-10). [*See* DE 45 at 32-34].

I.    *DE 56- Wabash Valley Hydrovac, LLC; Douglas Williams*

I begin my discussion of the various motions to dismiss by considering the arguments of Wabash Valley Hydrovac, LLC ("Wabash Valley") and associated Defendant Doug Williams who filed the first motion to dismiss. [DE 56]. Although one would not know it by reading the SAC, evidently, Mr. Williams is somehow affiliated with Wabash Valley.

In their Memorandum in Support of their Motion to Dismiss, Wabash Valley and Williams argue that the complaint fails to put them on notice of the claims against them. [DE 57 at 4]. Wabash Valley states that it "cannot determine what acts it is alleged to have taken to join the conspiracy or whether it is alleged to have conspired with one, ten, or all thirty-five defendants and how that particular alleged conspiracy injured the Plaintiffs." [*Id*. at 5]. As the Defendants explain, the SAC alleges that the unions and the Health and Welfare Funds "breached their respective fiduciary duties and committed other unlawful acts" to benefit Wabash Valley and other hydrovac companies who compete with HoosierVac. [DE 45 at 10].

Plaintiffs make the vague assertion that this case "arises from a wide-ranging conspiracy and unlawful scheme orchestrated by Defendants - including Badger, K2 Industries, Ground Breakers, and to an extent Wabash Valley Hydro through Douglas Williams . . . ." [DE 45 at 9]. Plaintiffs also assert that Wabash Valley and Doug Williams

8

somehow benefitted from the alleged conspiracy stating that the unions used this "tactic to dismantle the Plaintiffs to benefit Badger, K2 Industries, Groundbreakers, and Wabash Valley Hydro . . . ." [*Id*. at 11]. Simply asserting that a conspiracy exists, and Wabash Valley and Williams somehow benefitted from it does not include enough factual matter to state a claim for relief against these two Defendants. *O'Gorman v. City of Chicago*, 777 F.3d 885, 888 (7th Cir. 2015) (explaining that while a complaint need not contain detailed factual allegations, it must contain sufficient factual matter to state a claim for relief that is facially plausible).

The SAC attempts to connect Wabash Valley and Doug Williams to other alleged conspirators stating "Joe Hayden . . . did not have a good relationship with Douglas Willams-Wabash Valley but developed one in order to assist in harming the Plaintiffs." [DE 45 at 22]. But this is nothing more than a conclusion. The complaint also states that "Joe Hayden urged and encouraged HoosierVac employees to leave HoosierVac" and that several HoosierVac employees "jumped and went to Ground Breakers or Wabash Valley." [*Id*. at 23]. Even taking as true that some HoosierVac employees left and decided to work at Wabash Valley at the encouragement of Joe Hayden (a Local 103 BA), that is not enough to show an antitrust conspiracy.

To plead a violation of Section 1 of the Sherman Act, a plaintiff must allege that the defendant (1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 833 (7th Cir. 2021). The simple

allegation that Joe Hayden had a "relationship" with Doug Willams is not enough factual content to allege (or the Court to assume) that Hayden and Williams entered an agreement to convince HoosierVac's workers to jump ship and work for a different shop. *CJA Enters., Inc. v. Harbridge Merch. Servs., Inc.*, 1992 WL 142577, at *3 (N.D. Ill. June 18, 1992) (explaining that to state a claim under Section 1 of the Sherman Act a plaintiff must allege joint conduct or concerted action). *See also*, *MDFC Loan Corp. v. First Shopping Ctr. P'ship*, 1996 WL 99909, at *11 (N.D. Ill. Mar. 1, 1996) ("A court is not required to draw all possible inferences in favor of the party against whom a motion to dismiss is raised, but only those inferences that are reasonable.").

Simply put, it would be unreasonable for the Court to assume that Williams and Hayden entered an agreement to steal HoosierVac's workers where there is nothing more than an assertion that the two had a "relationship." Such an assumption is even more unreasonable considering that the complaint states that Hayden and Williams "did not have a good relationship" before jumping to the conclusion that they formed a brotherly bond for the sole purpose of harming HoosierVac.

The complaint also makes the broad allegation that the Defendants "collectively orchestrated a series of anticompetitive practices, including an agreement to fix prices for services, eliminating competition and artificially inflating prices to the detriment of consumers and competitors . . . for the benefit of Badgers, K2, Ground Breakers and Wabash Valley." [DE 45 at 29]. The allegations of wrongdoing against Wabash Valley and Doug Williams are simply incomprehensible. Plaintiffs only make broad allegations

10

against **<u>all</u>** of the Defendants. Which begs the question, exactly what role did Wabash Valley play in this alleged conspiracy? The complaint describes Wabash Valley as "sitting on the sidelines waiting to take over." [DE 45 at 30]. But it's entirely lost on me how one could participate in a conspiracy while "sitting on the sidelines."

Plaintiffs have also failed to plead a violation of Section 2 of the Sherman Act. To plead a violation of Section 2 of the Sherman Act, a plaintiff must allege: (1) a dangerous probability of success to create a monopoly; (2) a specific intent to monopolize; and (3) predatory or anticompetitive acts engaged in to monopolize. *Pollenex Corp. v. Sunbeam-Home Comfort*, 1992 WL 199080, at *1 (N.D. Ill. Aug. 7, 1992) (citing *Lektro–Vend Corp. v. Vendo Co.* 660 F.2d 255, 270 (7th Cir. 1981)). As the Defendants explain, the SAC does not allege Wabash Valley had an intent to achieve a monopoly in the hydrovac industry or that it had a dangerous probability of achieving such a monopoly.

The vague allegations against Wabash Valley and Doug Williams in the SAC are insufficient to allege claims under the Sherman Act (Counts I and II). The SAC also makes no mention of any actions taken by Wabash Valley or Williams to intentionally induce a breach of its contracts or interfere with its business relationships and it does not allege that Wabash Valley or Williams is a party to a CBA or any other contract with HoosierVac. As such, Plaintiffs have also failed to state a claim against Wabash Valley for tortious interference (Count III) or breach of contract (Count IV). Wabash Valley and Doug Williams' Motion to Dismiss will therefore be granted in its entirety.

II.     <u>*DE 90- Badger Infrastructure Solutions USA Inc.*</u>

The next motion to dismiss to be addressed is the one filed by Badger Infrastructure Solutions USA Inc. ("Badger"). [DE 90]. Like Wabash Valley and Doug Williams, Badger asserts that the complaint is woefully deficient in its allegations against Badger. [DE 91 at 4]. Like Wabash Valley, the complaint asserts that Badger is a hydrovac competitor that benefitted from a wide-ranging conspiracy to drive HoosierVac out of the hydrovac industry. [DE 45 at 9]. Like Wabash Valley, the complaint fails to include any specific factual allegations about Badger's role in the alleged conspiracy.

In their SAC, Plaintiffs state that Badger is an international entity and includes language from Badger's website stating that Badger is "the largest provider of non-destructive excavating and related services in North America." [DE 45 at 13]. The complaint plainly asserts "Badger and K2 jointly control approximately 70% of the available work for union hydrovac operators." [*Id*. at 6]. So, what? Simply listing the market share of HoosierVac's competitors is not sufficient to allege a violation of the Sherman Act. *See, e.g., Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, 1992 WL 111133, at *2 (N.D. Ill. May 12, 1992) (explaining that to allege the ability to exert control over the market, plaintiff "must assert more than mere conclusory allegations of market share").

Plaintiffs also say that the Local 103 and Local 150 have weaponized their audit authority and grievance procedures to benefit Badger. [DE 45 at 10]. However, Plaintiffs provide no specific factual detail about any audits or grievances and how they have

12

benefitted Badger. Plaintiffs' complaint is wholly focused on explaining that Badger is a large player in the hydrovac industry and has benefitted from a wide-ranging conspiracy to push HoosierVac out of the hydrovac market. Again, there are no specific allegations of what Badger supposedly did to contribute to this conspiracy. The complaint alleges that Badger holds a "veto" over HoosierVac because the Local 150 will not allow HoosierVac to work in its jurisdiction without Badger's approval. [*Id.* at 16-17]. But again, this is merely a conclusion, and even if this were true, it is far from sufficient to allege an agreement to exclude HoosierVac from the hydrovac market.

There are also no specific allegations against Badger showing an intent to obtain a monopoly in the market. Without any specific facts relating to any of the Defendants, Plaintiffs assert "Defendants possess (or attempt to obtain) monopoly power in the regional hydrovac market." [DE 45 at 33]. Such a broad allegation falls far short of alleging any intent on Badger's part to obtain a monopoly. As Badger explains in its motion, by definition, there is no monopoly by any one defendant if all 25 defendants have a monopoly. Simply put, Plaintiffs have failed to allege a violation of both Section 1 and Section 2 of the Sherman Act against Badger.

Plaintiffs have also failed to allege tortious interference with their business relationships and contracts. A claim for tortious interference with business relationships requires: (1) the existence of a valid relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional interference with the relationship; (4) the absence of justification; and (5) damages. *Martell Elec., LLC v. Tishhouse*, 2022 WL

16714141, at *2 (N.D. Ind. Nov. 3, 2022). The standard for tortious interference with contracts is similar requiring: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages. *Id.*

The SAC's broad and conclusory allegation that "[d]efendants interfered by orchestrating employee walk-offs, advising contractors to replace [HoosierVac], and refusing emergency labor clearance" makes no specific allegations as to Badger. [DE 45 at 33]. Plaintiffs mention that they have contracts with "critical clients such as NIPSCO, Miller Pipe Line, NPL and others." [*Id.* at 10]. However, Plaintiffs include no specific allegations against Badger (or any of the other Defendants) as to *how* Badger's actions have caused the contracts to be breached. Plaintiffs only make the conclusory allegation that "Defendants have created a closed market environment that suppresses competition, elevates prices, stifles innovation, and restricts Plaintiffs' ability to grow and meet contractual obligations." [*Id.*] Such broad and conclusory allegations are not sufficient to inform Badger of the allegations against it. Again, Plaintiffs have failed to state a claim against Badger as to any of the claims asserted and Badger's Motion to Dismiss should be granted in its entirety.

III.    *DE 94- Ted Choucalas, K2 Industrial Services Inc.*

Continuing with my discussion of the allegations against HoosierVac's competitors, I next discuss the Motion to Dismiss filed by K2 Industrial Services Inc. ("K2") and its employee Ted Choucalas. [DE 94]. Like Wabash Valley and Badger

discussed above, Plaintiffs assert that K2 is a competitor in the hydrovac industry which benefitted from the conspiracy to drive HoosierVac out of the market. [DE 45 at 11].

In their brief in support of dismissal, K2 and Choucalas state "[t]he complaint fails to provide factual information about the claims against K2 and Choucalas, and Plaintiffs have pled themselves out of court." [DE 95 at 1]. As explained by K2 and Choucalas, Plaintiffs allege that K2 and Choucalas were part of a wide-ranging conspiracy along with the other Defendants. [*Id*. at 2]. The complaint states that "Badger and K2 jointly control 70% of the available work for union hydrovac operators." [DE 45 at 6]. The SAC devotes an entire page to a discussion about K2's acquisition history without mentioning anything about the allegations in this case. [DE 45 at 14]. Regarding K2's role in the alleged conspiracy, Plaintiffs only provide short conclusory allegations such as K2 stood to benefit from the actions of the unions and their Fund. [DE 45 at 10].

The SAC also makes allegations about K2's relationship with other Defendants without any explanation of how these relationships played a role in K2's alleged conspiratorial conduct. Plaintiffs say that K2 and Ted Choucalas had a relationship with Jeff Valles (a Local 150 BA) without any explanation of how that relationship fed into the alleged conspiracy. [DE 45 at 22]. Plaintiffs also say, "K2 Industries made an attempt to purchase Hoosier Vac by way of a straw man" and provide no additional information or explanation about how this attempted purchase contributed to the alleged conspiracy. [*Id*. at 21]. In sum, it is entirely unclear what K2 did, how they did it, who they did it with, and what negative impact (if any) it had on the Plaintiffs.

A successful complaint generally tells the defendant what they are alleged to have done, who was involved, where and when it took place, and what the impact was on the plaintiff. In other words, circling back to basic pleading standards, a complaint needs more than "labels and conclusions" and a "formulaic recitation of the elements" of the cause of action. It has to be *plausible*. That is the basic teaching of *Twombly*, 550 U.S. 544, 555-56 (2008), an antitrust case just like ours, and *Iqbal*, 556 U.S. 662 (2009). The complaint in this case falls far short of these basic standards.

Rule 8 requires a "short and plain" statement of the claims alleged and Defendants are not required to rack their brain attempting to figure out what allegations are being made against them. *Ross Bros. Const. Co. v. Int'l Steel Servs., Inc.*, 283 F.3d 867, 872 (7th Cir. 2002) (explaining that the "essential function" of a complaint is to put a defendant on notice of the claims alleged and that each allegation must be "simple, concise, and direct"); *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990) (explaining that a complaint should be drafted with "clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages" in search of the claim alleged). Here, Plaintiffs have failed to make a "short and plain" statement of the claims against K2 or Ted Choucalas as to any of the claims alleged.

Plaintiffs allege no facts showing that K2 or Choucalas entered an agreement to restrain trade or exclude HoosierVac from the hydrovac market. Plaintiffs state that K2 and Groundbreakers (whom I'll discuss in the next section) own and control the vast majority of the cognizant market but make no allegations as to any actions K2 has taken

with the intent to monopolize the hydrovac industry. As I've stated previously, it makes absolutely no sense for Plaintiffs to allege that every single one of HoosierVac's competitors seek to obtain a monopoly of the hydrovac industry. That is the exact opposite of a monopoly. *See, e.g., Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 731 (N.D. Ill. 2018) (explaining that a Plaintiff cannot allege that that a company has a "dangerous proximity of monopoly power" where it has acknowledged "the existence of a number of competitors" in the market).

Plaintiffs have also failed to make any specific factual allegations as to how K2 or Choucalas have impeded HoosierVac's business relationships or breached any contract with HoosierVac. Indeed, HoosierVac does not allege that K2 has any contracts with HoosierVac.

Aside from some very general allegations, the claims against K2 and Choucalas are not at all particular. As such, the claims against these defendants must be dismissed. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (explaining that even where a conspiracy is alleged "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful"). *See also, Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 n.5 (7th Cir. 1997) ("a district court may dismiss a complaint for failure to comply with the requirement of Rule 8(a)(2)"); *Wade v. Smith*, 1991 WL 504873, at *2 (S.D. Ind. May 30, 1991) ("A complaint which fails to comply with Rule 8 is subject to dismissal.").

IV.    *DE 122- Groundbreakers, LLC; Douglas Taylor*

Groundbreakers, LLC and its employee Douglas Taylor have also filed a Motion to Dismiss. [DE 122]. Groundbreakers is yet another HoosierVac competitor alleged to have benefitted from the scheme to drive HoosierVac out of the hydrovac market. As explained by Groundbreakers, they are mentioned throughout the complaint approximately 36 times, but none of these mentions have much substance. [DE 123 at 2]. Douglas Taylor is only mentioned a couple of times in the complaint and is described as the "second in command at Groundbreakers." [DE 45 at 15]. The complaint mentions that Taylor has a relationship with Stephen Scott (President of the Local 103 and Trustee of the Fund) with no further factual details. [*Id*. at 22]. Plaintiffs summarily assert (about all the Defendants) that "it was through these relationships that defendants carried out many of their tactics to eliminate Plaintiffs from the industry." [*Id*.]

Suffice it to say, simply stating that Doug Taylor has a relationship with Stephen Scott with no additional details regarding the relationship is insufficient to state any claim for relief against Doug Taylor.

Regarding Groundbreakers, Plaintiffs' complaint takes the same approach it has taken towards the other competitors alleged to have been involved in a vast conspiracy to get rid of HoosierVac. Plaintiffs begin by stating that Groundbreakers (along with the other competitors) jointly control 70% of the work available for hydrovac operators in midcentral Indiana. [DE 45 at 7]. After alleging that Groundbreakers controls a large share of the hydrovac market, Plaintiffs make the general allegation that the unions and

their Fund weaponized their audit and grievance procedures to push HoosierVac out of the market and benefit Groundbreakers. [*Id*. at 9, 11].

The SAC also provides information about the geographical scope of Groundbreakers' business stating that its "main competitive advantage lies in its local presence and specialized service within the Indianapolis region rather than on the national scale." [*Id*. at 15]. Plaintiffs explain that Groundbreakers has expanded its operations into Ohio, Kentucky, and Illinois and that "[t]his expansion shows their ambition to increase their market share beyond their home state." [*Id*.] Plaintiffs also assert that Groundbreakers attempted to purchase HoosierVac because it failed to steal HoosierVac's customers and break into the Lafayette Indiana market. [*Id*. at 18].

The SAC mentions that several HoosierVac employees left HoosierVac to go to work for Groundbreakers with no allegations that Groundbreakers did anything untoward to draw these employees. [DE 45 at 23]. Plaintiffs mention that at a September 2024 conference, Local 103 BAs Joe Hayden and Cory Lodge spoke about there being too many Local 103 operators in the Local 150 jurisdiction. [*Id*. at 26]. According to Plaintiffs, "the consequences of this talk encouraged local-wide elimination of HoosierVac from the hydrovac industry in which the union as well as Badgers, K2 and Ground Breakers have a stronghold." [*Id*.] HoosierVac's own statements contradict its assertion that there is a wide-ranging conspiracy to remove HoosierVac from the hydrovac industry. Plaintiffs' own statement about the "consequences" of the Local 103's conference suggests that any movement of HoosierVac's workers or hiccups in

completing work assignments are a "consequence" of an ongoing labor dispute with the unions and not a wide-ranging conspiracy to dry up HoosierVac's business.

The SAC has failed to allege any violations of the Sherman Act against Groundbreakers and Doug Taylor and has also failed to allege tortious interference with prospective business relations or breach of contract against these Defendants. The complaint, as against them, must therefore be dismissed.

V.    *DE 149- H.E.I. Utility Contractors Inc.*

Continuing with my discussion of Hoosier Vac's competitors, H.E.I. Utility Contractors Inc. ("HEI") has also filed a motion to dismiss. [DE 149]. HEI is another HoosierVac competitor allegedly involved in the conspiracy to destroy HoosierVac's business. Plaintiffs make only a handful of references to HEI in its complaint. Plaintiffs state "H.E.I. personnel have a relationship with the 150 BAs." [DE 45 at 22]. Plaintiffs also say "an HEI worker bragged about getting HV into trouble based on a false accusation that HoosierVac was working in the 150 with its operators . . ." [*Id*. at 25]. Plaintiffs also say that HEI was founded in 2003 as a single hydrovac unit but has since "grown into a whole fleet of units." [*Id*.]

Plaintiffs' bare-bones allegations against HEI led the company to file a Motion for a More Definite Statement [DE 96]. In its Motion for a More Definite Statement HEI explained "the Complaint fails to inform HEI of the specific conduct alleged, leaving HEI unable to meaningfully respond." [DE 97 at 5]. Plaintiffs filed a More Definite

Statement but as explained by HEI, it fails to clarify how HEI is involved in the alleged scheme. Here's what the Plaintiffs said in their More Definite Statement:

> HEI's role in the conspiracy was specific to its efforts in getting Plaintiffs "in trouble" with unions such as the Local 150 and the union members by fabricating events and incidents involving Plaintiffs in an effort to restrain the hydrovac market and claw back clients to HEI and the other Corporate Defendants.

[DE 140 at 2]. But the so-called "fabricated" event as described in the More Definite Statement is hopelessly vague. [*Id.*] Indeed, it is entirely unclear how HEI was even involved in it. In short, the "More Definite Statement" tells HEI nothing at all.

What's more, Plaintiffs admit that "HEI was not necessarily a main actor or principal in the various conspiratorial actions that constituted violations of the Sherman Act" but acted instead as a "co-conspirator with a specific role in violation of the law." [*Id.* at 4]. These allegations are startling thin. The Plaintiffs fail to make any straightforward factual allegations against HEI and instead talk in circles. HEI allegedly violated the Sherman Act but was not a "main actor." HEI also allegedly wants to hold a monopoly, but they also divide up customers with the other competitors. The wide-ranging conspiracy as alleged simply makes no sense.

In their More Definite Statement, Plaintiffs state that they have contracts with "NIPSCO, Northern Pipe Line, Miller Pipe Line, Bowen Engineering, and Michals Site Worx" and that the Corporate Defendants had "collective knowledge of the contracts because they were part of the Local 103 and Local 150 union programs." [DE 140 at 9]. But again, there are simply no factual allegations specific to HEI's role in interfering

with these contracts. Plaintiffs also failed to include any specific factual allegation as to how HEI breached a contract simply asserting that "Defendants jointly have either directly or indirectly caused and facilitated as part of the conspiracy a breach of contract that damaged Plaintiff." [*Id.*]

Plaintiffs have failed to allege a violation of the Sherman Act (Counts I and II) as against HEI and have also failed to allege tortious interference with business relationships or breach of contract (Counts III and IV). As such, HEI's motion to dismiss must be granted.

VI.    *DE 120- Richard Houston*

The next category of alleged conspirators are HoosierVac's former employees. One of them, Richard Houston, has also filed a Motion to Dismiss. [DE 120]. In his brief in support of his motion, Houston asserts that Hoosier Vac has failed to allege a claim as to any of its five counts. [DE 121 at 4-7].

Plaintiffs only mention Houston a handful of times in the SAC. Plaintiffs state that "Joe Hayden had a relationship with Richard Huston [sic]." [DE 45 at 21]. Plaintiffs allege that that Houston's role in the alleged conspiracy was providing Joe Hayden with HoosierVac internal information prior to resigning as the HoosierVac general manager. [*Id.* at 24-25]. Plaintiffs also allege that Houston deleted information from his HoosierVac assigned tablet but believe someone must have helped him do this because Houston "was not competent at the time to even know how to delete anything from the tablet." [*Id.* at 25].

22

I'm entirely unclear what any of that even means. But even taking as true the allegation that Houston provided internal business information to Joe Hayden, Plaintiffs have failed to allege a violation of either Section 1 or Section 2 of the Sherman Act. Recall that Joe Hayden is a BA with the Local 103. The Local 103 is a labor union which provides workers in its district with a collective voice to negotiate for better wages and working conditions. The fact that Joe Hayden received information from Houston does not lend itself to an inference that the information was provided to help HoosierVac's competitors monopolize the market. To infer that the information provided to Joe Hayden went from the Local 103 to HoosierVac's competitors for the purpose of helping the competitors gain an advantage and push HoosierVac out of the hydrovac industry is nothing more than an unfounded and unreasonable inference. *MDFC Loan Corp.*, 1996 WL 99909, at *11 (N.D. Ill. Mar. 1, 1996) ("A court is not required to draw all possible inferences in favor of the party against whom a motion to dismiss is raised, but only those inferences that are reasonable.").

Moreover, Plaintiffs' SAC incudes no specific factual allegations regarding any actions Houston took to interfere with HoosierVac's business relationships. Plaintiffs also fail to allege that Houston's sharing of HoosierVac information breached any contract he had with the company. As such, HoosierVac has failed to state a claim for relief against Houston and his motion to dismiss must be granted.

VII. <u>*DE 128- T.J. Berchtold, Derek Lane, Alex Meyers, William Scheibelhut*</u>

23

Former Hoosier Vac employees Ted J. Berchtold, Derek Lane, Alex Meyers, and William Scheibelhut have also filed a Motion to Dismiss. [DE 128]. In the complaint, Plaintiffs allege that Joe Hayden has a relationship with each of these individuals. [DE 45 at 21]. Like Houston, Plaintiffs assert that these former HoosierVac employees contributed to the conspiracy to push HoosierVac out of the hydrovac industry by sharing HoosierVac's electronically stored information. [DE 45 at 24].

Plaintiffs state that Meyers accessed the Hoosier Traffic tablet system of Hoosier Traffic, LLC a different company owned by Lauren Mullins (who also owns HoosierVac). Hoosier Traffic, LLC is not a Plaintiff in this lawsuit, so it is unclear how the alleged theft of Hoosier Traffic's information relates to the allegations made in this case by HoosierVac and HoosierX. Plaintiffs also state that Meyers "shared this information with his brother Willaim Scheibelhut who was seeking traffic control work with a different company." [*Id.*] The complaint also states that Meyers is a close friend of Local 103 BA Cory Lodge with no additional details. [*Id.*] The complaint makes no mention of Scheibelhut other than to say he received information from his brother while searching for a job.

The complaint mentions Berchtold and Lane only a few times. The complaint states that "TJ Berchtold provided Joe, through Huston [sic] with information about HoosierVac." [DE 45 at 25]. The complaint mentions that Lane had a relationship with Joe Hayden and Jeff Valles (a Local 150 BA) without any further details. [DE 45 at 21, 22].

None of this comes close to alleging an involvement in an antitrust conspiracy by any of these Defendants. Plaintiffs have also failed to allege any facts supporting a tortious interference or breach of contract claim against these defendants. As such, their motion to dismiss should be granted.

VIII.   *DE 124- Local 103, Joe Hayden, Stephen Scott, Cory Lodge*

The Local 103 and related Defendants Stephen Scott, Joe Hayden, and Cory Lodge have also filed a motion to dismiss the claims presented against them in this action. [DE 124]. As explained in their brief in support of their motion to dismiss, Stephen Scott is the President of the Local 103 while Hayden and Lodge are both business agents of the union. [DE 125 at 3]. Similar to the other Defendants, the Local 103 Defendants also argue that Plaintiffs have failed to meet Rule 8's pleading standards and, as such, the complaint should be dismissed.

The Local 103 Defendants argue that the complaint "falls far short of suggesting a right to relief under any of the five counts." [DE 125 at 6]. As I've mentioned, the complaint makes the conclusory allegation that the Local 103 abused its audit and grievance procedures to benefit HoosierVac's competitors. As pointed out by the Local 103 Defendants, the complaint makes no mention of what audit authority was abused or what grievances were filed. [DE 125 at 7]. Such vague allegations are insufficient to allege a violation of Section 1 of the Sherman Act.

The complaint states that Local 103 "controls what hydrovac companies can work in its jurisdictions" and says that this leads competitors like Badger and

Groundbreakers to protect their turf and exclude competitors like HoosierVac. [DE 45 at 16]. Such an allegation, again, fails to allege any agreement on the part of the Local 103 and HoosierVac's competitors to drive them from the market.

As explained by the Local 103, unions are generally exempt from antitrust liability. *Mid-America Regional Bargaining Asso. v. Will County Carpenters Dist. Council*, 675 F.2d 881, 884 (7th Cir. 1982). The Local 103 is a labor union which does not compete with HoosierVac for customers so any claims that it has violated Section 2 of the Sherman Act by attempting to achieve a monopoly in the market are baseless.

Plaintiffs say that "Union 103 and 150 office holders cancelled multiple work contracts that HoosierVac had with contractors that utilized them to provide services." [DE 45 at 22]. Plaintiffs state that the cancelled contracts include contracts with "Northern Pipe Line (NPL), Miller Pipe Line (MPL), Bowen Engineering, Michals, Site Worx and others." [*Id*. at 23]. Plaintiffs state that "Defendants intentionally interfered by orchestrating employee walk-offs, advising contractors to replace HV, and refusing emergency labor clearance, resulting in lost contracts and reputational harm." [*Id*. at 33].

Plaintiffs provide no specific factual allegations regarding how the Local 103 caused employee walk-offs and other actions but even assuming the Local 103 did these things, Plaintiffs have not stated a claim for tortious interference. As explained by the Local 103, Plaintiffs' state law tortious interference claim would be preempted by federal labor law because issues involving walking off the job, supplying operators through the local unions' hiring halls, and "emergency labor clearance[s]" would turn

on the meaning and application of the applicable Collective Bargaining Agreements (CBA). [DE 125 at 13]. *See also, Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988) (explaining that if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law is preempted, and federal labor-law principles apply).

Plaintiffs also assert a breach of contract claim "[t]o the extent certain Defendants were parties to CBAs or other agreements with Plaintiffs." [DE 45 at 33]. However, as the Local 103 explains, Plaintiffs have not identified any CBAs or other contracts with the Local 103 which have been breached, have not specified which provisions were breached, have not stated when the alleged breach occurred, and have not stated which actions led to the breach. [DE 125 at 14]. Plaintiffs have failed to put the Local 103 on notice as to what actions breached what provisions of what contracts and, as such, have failed state a breach of contract claim against the Local 103. *Chandra V. Pharm. Consultants, LLC v. Bausch Health Ireland Ltd.*, 2024 WL 3342508, at *3 (N.D. Ill. July 8, 2024) ("To state a valid claim for breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise."); *F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 961, 977 (N.D. Ind. 1999) (explaining that to assert a contract claim the Plaintiff must put the Defendant on notice of the claim).

In relation to the individual Local 103 Defendants, Plaintiffs again provide no specific factual allegations to support any of the claims alleged. Plaintiffs state that "Joe Hayden urged and encouraged HoosierVac employees to leave HoosierVac" and was

given electronically stored information from former HoosierVac employees. [DE 45 at 23-25]. These allegations, even if true, do not support a violation of either Section of the Sherman Act and do not support Plaintiffs' tortious interference or breach of contract claims. Regarding Stephen Scott, Plaintiffs say that he "set up an audit of HoosierVac that was pretextual." [*Id.* at 26]. Plaintiffs provide no additional information regarding how the alleged audit played into a conspiracy to push HoosierVac out of the hydrovac industry. Plaintiffs say that Cory Lodge had a relationship with various former HoosierVac employees (without any additional detail), and that Lodge attended a Local 103 conference discussing "too many 103 operators in the 150 jurisdiction." [*Id.* at 21, 26]. Again, none of the allegations against the individual Local 103 Defendants support the claims asserted against them in this case.

Like the others, the Local 103 Defendants' Motion to Dismiss will be granted.

IX.    *DE 130- Local 150 and the Individual Business Agents*

The other labor union allegedly involved in a scheme to drive HoosierVac out of the hydrovac market is the Local 150. The Local 150 and its individual business agents—Nicholas Cline, Jason Creasbaum, Jimmie Gardner, John Sorenson, Jeff Valles, and John Watson—have all filed a Motion to Dismiss the claims brought against them. [DE 130].

In the SAC, Plaintiffs state that the unions "play a significant role in setting wages, working conditions, and hiring procedures." [DE 45 at 5]. Like Local 103, Plaintiffs make the broad allegation that Local 150 weaponized its audit authority and

grievance procedures to benefit HoosierVac's competitors [*Id.* at 10]. Plaintiffs also state that Local 150 controls union membership rolls preventing HoosierVac from operating in Local 150's jurisdiction when the union cannot provide it workers. [*Id.* at 16].

Again, it appears that Plaintiffs are attempting to turn their dispute with the labor unions regarding when they can obtain workers authorized to operate in the unions' respective jurisdictions into an antitrust conspiracy. In the SAC, Plaintiffs state "[t]he conduct complained of in this case restrains trade through the misinterpretation of parts of the governing documents executed between HoosierVac and the Defendants like 150 . . . ." [DE 45 at 9]. Presumably, the "governing documents" being referenced in the SAC are the CBA and related agreements typically entered into between an employer and a union. All of which makes this sound much more like a labor dispute between HoosierVac and Local 150, than it does an antitrust conspiracy. Indeed, as explained by Local 150, they are a labor union and not a competitor of HoosierVac's. It makes no sense that the unions would want to push HoosierVac out of the market to benefit its competitors. There is undoubtedly a quarrel between HoosierVac and the Defendants, but Plaintiffs have failed to allege that it is because the unions have joined up with its competitors and concocted an elaborate plan to steal HoosierVac's business. Plaintiffs have simply alleged no facts in the SAC supporting such a conclusory allegation.

Regarding the individual Local 150 BAs, Plaintiffs make the conclusory allegation that all of them engaged in a coordinated conspiracy to undermine

HoosierVac's business operations by engaging in "price-fixing, customer allocation, and interference with contractual relationships, all aimed at restraining trade and monopolizing the market in violation of the Sherman Act." [DE 45 at 29]. These are nothing more than buzzwords. Where are the facts? Indeed, each of the BAs are mentioned only a handful of times throughout the 35-page complaint, and Plaintiffs make no attempt to spell out what specific actions each Local 150 BA supposedly engaged in.

Plaintiffs attempt to connect the Local 150 BAs to other Defendants to try to show a conspiracy. Plaintiffs summarily say that Jeff Valles "had a relationship" with Ted Choucalas, Joe Hayden, Cory Lodge, and others. [DE 45 at 22]. But that's scarcely enough to make out a claim. As for Defendants Jimmie Gardner and John Sorenson, Plaintiffs mention that they have a relationship with others with no additional details. Plaintiffs say that both Sorenson and Gardner have a relationship with former HoosierVac employees Justin Dehart and Dave Wise and say that Gardner has a relationship with Joe Hayden. [*Id*. at 21, 22]. Worse, Plaintiffs themselves admit they have no idea why Creasbaum and Cline are in this lawsuit stating, "BAs Creasbaum and Cline have no connection yet known to the Plaintiffs but have an apparent connection with K2." [*Id*. at 22]. This admission by the Plaintiff as it relates to Creasbaum and Cline borders on a Rule 11 violation. It is an admission that HoosierVac has brought a lawsuit against these defendants without first conducting "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b).

30

In short, none of this comes close to alleging a violation of the Sherman Act, tortious interference, or breach of contract against these Defendants. The Local 150 Defendants' Motion to Dismiss should also be granted.

X.    *DE 126- Mid Central Operating Engineers Health and Welfare Fund, Stephen Scott*

Finally, I address the Motion to Dismiss filed by the Mid Central Operating Engineers Health and Welfare Fund ("Fund") and Stephen Scott as Trustee of the Fund. [DE 126]. Like the other Defendants discussed, the Fund has moved to dismiss stating that Plaintiffs have failed to meet Rule 8's pleading standard in relation to the Fund.

In the SAC, Plaintiffs say the Fund ensures benefits to union members through the collection of dues and other fees placed in the trust of the funds. [DE 45 at 5]. Plaintiffs also say that "[n]either union wages nor health and welfare benefits are in issue." [*Id.*] Plaintiffs assert that the Fund is not permitted to regulate competition and is not responsible for representing the interests of the contractors that use their services. [*Id.*]

Like its allegations against the other Defendants, Plaintiffs assert the Fund's participation in a "wide-ranging conspiracy" without alleging any specific facts to support that conclusion. Plaintiffs assert that the Fund (along with the unions) weaponized their audit authority and grievance procedures to benefit HoosierVac's competitors. [DE 45 at 10]. Plaintiffs also say that Stephen Scott as Fund trustee "set up

an audit of HoosierVac that was pretextual." [*Id.* at 26]. Plaintiffs also say that the Funds transmitted HoosierVac employee data to the "JGC."[3] [*Id.* at 27].

Plaintiffs utilize the same broad, vague, and conclusory allegations it has asserted against each of the other Defendants to support its claims against the Fund and Stephen Scott as trustee of the Fund. For the reasons I've explained, Plaintiffs have failed to state any claims for relief against the Fund or Scott, and their motion to dismiss should be granted.

XI.    *John Does 1-10*

In addition to the 25 Defendants named in the SAC, Plaintiffs also bring their complaint against "John Does 1-10." [DE 45 at 2-3]. All claims against "John Does 1-10" should also be dismissed for failure to state a claim upon which relief can be granted. *Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997) (explaining that "it is pointless to include lists of anonymous defendants in federal court"); *Kleiman v. Heflin*, 2025 WL 2305855, at *3 (S.D. Ind. Aug. 11, 2025) (dismissing unknown defendants for failure to state a claim).

### Conclusion

Plaintiffs have not come close to alleging an antitrust conspiracy in violation of the Sherman Act (Counts I and II), tortious interference with its business relations

---

[3] As explained by the Fund, Plaintiffs do not explain what the acronym "JGC" means. However, based on the context of its usage, it appears that Plaintiffs are referring to the Joint Grievance Committee (JGC) which handles employee grievances in the labor union context.

(Count III), breach of contract (Count IV), or a violation of the Privacy Act (Count V) as to any of the Defendants in this case.

There is simply no coherent explanation, allegation, or assertion containing specific facts about how each Defendant contributed to the wide-ranging conspiracy alleged. Plaintiffs provide only conclusory statements about how all the Defendants acted in concert to harm HoosierVac and exclude it from the hydrovac industry. It is impossible for any individual Defendant to understand from the SAC what allegations are being made against it and what allegations are being asserted against the other Defendants involved. In short, Plaintiffs' shotgun complaint is not plausible, and it does contain sufficient factual allegations to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, it fails to "present a story that holds together." *Swanson*, 614 F.3d at 404. It must therefore be dismissed.

While this is now Plaintiffs' Second Amended Complaint and Plaintiffs' third bite at the apple to articulate actionable claims, this is the first dismissal of Plaintiffs' complaint. Plaintiffs' previous amendments were prompted by Plaintiffs' own action. [*See* DE 15; DE 44; DE 45]. Because this is the Court's first dismissal of Plaintiffs' claims, Plaintiffs should be granted an opportunity to amend their complaint. *Rodgers v. Genesis Behav. Servs. - Crossroads*, 2023 WL 7272360, at *2 (7th Cir. Nov. 3, 2023) (explaining that district courts should give litigants the opportunity to amend a complaint at least once after dismissal); *Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 908 (N.D. Ill. 2016) (same). Consistent with Federal Rule of Civil Procedure Rule 11(b), Plaintiffs should file

an amended complaint only if the "legal contentions are warranted" and any "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b).

**ACCORDINGLY**:

1.  Defendants Wabash Valley Hydrovac, LLC and Doug Williams' Motion to Dismiss [DE 56] is **GRANTED**.

2.  Defendant Badger Infrastructure Solutions USA, Inc.'s Motion to Dismiss [DE 90] is **GRANTED**.

3.  Defendants K2 Industrial Services Inc. and Ted Choucalas' Motion to Dismiss [DE 94] is **GRANTED**.

4.  Defendant Richard Houston's Motion to Dismiss [DE 120] is **GRANTED**.

5.  Defendants Groundbreakers, LLC and Douglas Taylor's Motion to Dismiss [DE 122] is **GRANTED**.

6.  Defendants Local 103, Stephen Scott, Joe Hayden, and Cory Lodge's Motion to Dismiss [DE 124] is **GRANTED**.

7.  Defendant Mid Central Operating Engineers Health and Welfare Fund and Stephen Scott's Motion to Dismiss [DE 126] is **GRANTED**.

8.  Defendants T.J. Berchtold, Derek Lane, Alex Meyers, and William Scheibelhut's Motion to Dismiss [DE 128] is **GRANTED**.

9.  Defendants Local 150, Nicholas Cline, Jason Creasbaum, Jimmie Gardner, John Sorenson, Jeff Valles, and John Watson's Motion to Dismiss [DE 130] is **GRANTED**.

10. Defendant H.E.I. Utility Contractors Inc.'s Motion to Dismiss [DE 149] is

**GRANTED**.

Plaintiffs' Second Amended Complaint [DE 45] is **DISMISSED WITHOUT PREJUDICE**, for failure to comply with Federal Rule of Civil Procedure 8(a). Plaintiffs' pending Motion for a Preliminary Injunction [DE 160] is **DENIED AS MOOT**. *Venezia v. Robinson*, 16 F.3d 209, 211 (7th Cir. 1994) ("A preliminary injunction cannot survive the dismissal of a complaint.").

Plaintiffs are **INSTRUCTED** to file an amended complaint on or before **February 6, 2026**, to the extent they believe they can remedy the deficiencies addressed in the Court's order.

**SO ORDERED**.

ENTERED: December 29, 2025.

 /s/ Philip P. Simon                         
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT